IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>vs.<br><br>NATASHA M. WOLFE,<br><br>                Defendant. | 8:17CR154<br><br>**FINDINGS AND RECOMMENDATION** |

      This matter is before the Court on the Motion to Suppress Evidence (Filing No. 73) filed by Defendant, Natasha M. Wolfe. Defendant filed a brief (Filing No. 74) in support of the motion and the government filed a brief (Filing No. 82) in opposition.

      The Court held an evidentiary hearing on the motion on October 31, 2017. Defendant was present with her attorney, Joseph Howard. The government was represented by Assistant United States Attorney, Lecia Wright. FBI Special Agent (SA) Bradley J. Purscell testified on behalf of the government. Exhibits 1-3 were offered by the government and received by the Court without objection. A transcript (TR.) of the hearing was prepared and filed on November 7, 2017. (Filing No. 107). The matter is now fully submitted to the Court. For the following reasons, the undersigned magistrate judge recommends that the motion be granted.

## BACKGROUND

      SA Purscell testified that he is employed by the FBI and has been for twenty-one years. He has a four-year degree and completed sixteen weeks of training at the academy. Before his career began in law enforcement, he was a Captain in the U.S. Army. He is assigned to investigate Indian crimes in the District of Nebraska, which includes the Santee Sioux, Winnebago, and Omaha Nations. (TR. 8).

      On April 23, 2017, at approximately 10:00 a.m., SA Purscell was called in for briefing and investigation regarding the death of William Redhorn, Jr. ("Redhorn"). The drive from Sioux City is about forty-five minutes. Upon arrival, SA Purscell met with Jason Lawrence, Chief of the Winnebago Police Department. Relatives initially identified the deceased as Redhorn, which identification was verified by the decedent's mother, Judy Redhorn. (TR. 9-10). SA Purscell observed Redhorn's body lying face down on the slope of the hill of the front lawn

next to the street of the Ho-Chunk Building. SA Purscell testified that it appeared that Redhorn had been in a physical altercation due to the evidence of trauma to his face and head and visible blood on his face. (TR. 11). Redhorn's clothing was askew and a sweatshirt was found next to his body. SA Purscell secured the area with crime scene tape and called in the FBI evidence response team, his agency's version of a "CSI" unit, to process the scene. SA Purscell then spoke with Judy Redhorn as part of his investigation. (TR. 12).

Later that evening, Chief of Police Lawrence received a phone call from an off-duty police officer, Sergeant Gordon Rave. Chief of Police Lawrence handed the phone to SA Purscell, and Sergeant Rave relayed the information that he had been cutting his grass in Walthill when he was approached by two persons, later identified as Lawrencia Merrick ("Lawrencia") and Jeremiah Wolfe ("Jeremiah"), who said they wanted to make statements. (TR. 13-14). Lawrencia and Jeremiah followed Sergeant Rave to the police station and arrived about five minutes after Sergeant Rave's phone call. (TR. 13).

SA Purscell interviewed both Lawrencia and Jeremiah. Lawrencia gave a detailed account of the events leading up to her encounter with Redhorn, which included both verbal and physical altercations. (TR. 16). Two other individuals were also involved, a juvenile and Defendant. Lawrencia stated they had driven in Jeremiah's vehicle to an area near the Ho-Chunk building to use free Wi-Fi. While they were there, they observed William Redhorn "messing with" or attempting to get into the Ho-Chunk building. (TR. 14-15). A foot chase ensued resulting in Jeremiah and Redhorn fighting and Jeremiah placing Redhorn in a chokehold. (TR. 17). Lawrencia stated that Redhorn was slurring his words and threw a punch at her head but missed. Lawrencia stated that she followed Jeremiah during the foot chase and that Redhorn slipped down a small grassy hill slipped before the fight with Jeremiah. (TR. 20). Lawrencia also stated that the juvenile hit Redhorn with a bag and that Defendant tried to break up the fight by pulling at least one person off of Redhorn. (TR. 21). Importantly, Lawrencia also divulged that the bloody clothing that had been worn during the altercation was at home after being washed at Defendant's house. (TR. 22-23). SA Purscell testified that Jeremiah's statement, although a shorter version, was substantially the same as the statement given by Lawrencia. (TR. 21-22).

On April 26, 2017, SA Purscell interviewed Defendant in Chief Lawrence's office at the at the Omaha Nation Law Enforcement Services. (TR. 23). Defendant had been arrested on a

Winnebago tribal warrant related to the death investigation and was in tribal custody at the Omaha Nation jail. (TR. 23-24). Although Defendant was not in handcuffs when SA Purscell interviewed her, she remained in custody and was not free to leave the facility. (TR. 24, 26). SA Purscell provided Defendant with *Miranda* warnings as the two prerequisites were present: interrogation and in custody. SA Purscell used the standard FBI form to advise Defendant of her *Miranda* rights and to obtain her waiver of those rights. Defendant acknowledged and waived her rights by signature. (TR. 26-30; Exhibit 3). The form was dated April 26, 2017, and SA Purscell noted he began the rights advisement at 11:51 a.m., in Macy, Nebraska (TR. 29; Ex. 3).

The office where the interview took place was of concrete construction and about twelve feet square in size. The door was closed but not locked. (TR. 24-25). SA Purscell and Natasha Wolfe sat at opposite sides of a desk. Defendant's demeanor during the roughly thirty minute interrogation was that of being bored and uninterested, and she continually yawned. (TR. 31). The audio recording of the interrogation (Ex. 1) and transcription of the interrogation (Ex. 2) were received into evidence. (TR. 32). SA Purscell did not raise his voice, promise any benefits, or make any threats. (TR. 37-38).

Defendant did not have any questions during the *Miranda* warnings and stated that she understood and acknowledged the same. SA Purscell believed that she had waived her rights. (TR. 33). SA Purscell also advised Defendant that "If you decide to answer questions now without a lawyer present you have a right to stop answering at any time" and "[so] if you decide to talk to me and you want to stop, we can stop." (Ex. 2 at p. 5). SA Purscell testified that as he was winding up the interview, Defendant stated that she would like to stop.[1] (TR. 36). Although she had not asked for a lawyer, Defendant had started to be non-responsive. (TR. 36). However, SA Purscell wanted to ask another question and did not take Defendant's statement as invoking the right to cease questioning, but rather that Defendant was just tired of being questioned. (TR. 37). SA Purscell then asked Defendant what "Kuna" meant. After Defendant answered the question, she stated, "I'm sorry. I can't help you no more." (Ex. 2 at page 33). According to SA Purscell, Defendant's demeanor was the same, bored and tired. Nonetheless, SA Purscell proceeded to ask Defendant if she had any knowledge that Lawrencia and Defendant's son washed their clothes because they had blood all over them. (Ex. 2 at p. 33; TR. 38). Defendant responded, "No, I didn't know." (Ex. 2 at page 33). The interrogation then concluded.

---

[1] Defendant actually stated, "Okay, I just want to quit now." (Ex. 2 at page 33).

The government, in this prosecution for being an accessory after the fact, argues that the analysis of whether Defendant invoked her right to have SA Purscell cease further questioning should be done in context, in light of the entire interview, given Defendant's detached and disinterested demeanor. (TR. 40-41). Defendant counters that there was an unequivocal and unambiguous invocation by Defendant of her Fifth and Sixth Amendment rights, arguing that SA Purscell had not yet addressed the important issue of the clothes washing when the rights were invoked, and that her responses to further questions were incriminatory and should be suppressed. (TR. 44-45).

## ANALYSIS

Evidence obtained by the police during custodial interrogations cannot be used in court during trial unless the defendant was first informed of the right not to incriminate herself and the right to a lawyer. *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966). It is undisputed that Defendant was interrogated while in custody during her interview on April 26, 2017, and that she was provided with *Miranda* warnings. The sole question before the Court is whether Defendant invoked her right to remain silent, or her right to counsel, during the custodial interrogation.

As stated by the Eighth Circuit Court of Appeals:

> During an interrogation, "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda,* 384 U.S. at 473-74, 86 S.Ct. 1602. "To adequately invoke this right and effectively cut off questioning, a suspect must indicate 'a clear, consistent expression of a desire to remain silent.'" *United States v. Johnson,* 56 F.3d 947, 955 (8th Cir.1995) (quoting *United States v. Thompson,* 866 F.2d 268, 272 (8th Cir.1989)). "We consider the defendant's statements as a whole to determine whether they indicate an unequivocal decision to invoke the right to remain silent." *Id.*

*United States v. Adams*, 820 F.3d 317, 322-23 (8th Cir. 2016).

Considering her statements as a whole, Defendant's assertion that "Okay, I just want to quit now," was a clear, unequivocal, and unambiguous request to invoke her right to remain silent and to end the interrogation. Yet, SA Purscell continued to ask questions which were likely to lead to incriminatory responses. Given the clear directive of the decisions of the United States Supreme Court and the Eighth Circuit Court of Appeals, the undersigned magistrate judge

concludes that the continued interrogation of Defendant was in violation of the Fifth Amendment and the resulting responses must be suppressed at the trial of this matter. Accordingly,

**IT IS HEREBY RECOMMENDED** to United States District Court Judge Robert F. Rossiter, Jr., that Defendant's Motion to Suppress Evidence (Filing No. 73) be granted.

Dated this 14th day of November, 2017.

BY THE COURT:

s/ Michael D. Nelson
United States Magistrate Judge

## ADMONITION

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.